| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF** <u>RICHLAND</u> | ) | |
| | ) | |
| FIREMEN'S RETIREMENT SYSTEM OF ST. | ) | **CIVIL ACTION COVERSHEET** |
| LOUIS, Derivatively on Behalf of SCANA | ) | |
| CORPORATION | ) | |

**Plaintiff(s)** )

vs. )

KEVIN B. MARSH, JIMMY E. ADDISON,
STEPHEN A. BYRNE, D. MAYBANK
HAGOOD, LYNNE M. MILLER, JAMES A.
BENNETT, MACEO K. SLOAN, SHARON A.
DECKER, JAMES W. ROQUEMORE,
ALFREDO TRUJILLO, JOHN F.A.V. CECIL,
GREGORY E. ALIFF, JAMES M. MICALI, and
HAROLD C. STOWE

Defendants,

-and-

SCANA CORPORATION, a South Carolina
Corporation,

Nominal Defendant.

**Defendant(s)** )

**2017-CP-400-7547**

2017 DEC 13 PM 3:30
JEANNETTE W. MCBRIDE
C.C.P. & G.S.
RICHLAND COUNTY
FILED

| | | |
|---|---|---|
| **Submitted By:** <u>James M. Griffin</u> | **SC Bar #:** | <u>9995</u> |
| **Address:** <u>1116 Blanding Street, First Floor</u> | **Telephone #:** | <u>803-744-0800</u> |
| <u>Columbia, SC 29201</u> | **Fax #:** | <u>803-744-0805</u> |
| | **Other:** | |
| | **E-mail:** | <u>jgriffin@griffindavislaw.com</u> |

**NOTE:** The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this coversheet must be served on the defendant(s) along with the Summons and Complaint.

## DOCKETING INFORMATION (*Check all that apply*)
***If Action is Judgment/Settlement do not complete**

☒ **JURY TRIAL** demanded in complaint.     ☐ **NON-JURY TRIAL** demanded in complaint.
☐ This case is subject to **ARBITRATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is subject to **MEDIATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

## NATURE OF ACTION (*Check One Box Below*)

| **Contracts** | **Torts - Professional Malpractice** | **Torts – Personal Injury** | **Real Property** |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Conversion (310) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Motor Vehicle Accident (320) | ☐ Condemnation (410) |
| ☐ General (130) | ☐ Medical Malpractice (220) | ☐ Premises Liability (330) | ☐ Foreclosure (420) |
| ☐ Breach of Contract (140) | Previous Notice of Intent Case # | ☐ Products Liability (340) | ☐ Mechanic's Lien (430) |
| ☐ Fraud/Bad Faith (150) | 20____-NI-____-_____ | ☐ Personal Injury (350) | ☐ Partition (440) |
| ☐ Failure to Deliver/ | ☐ Notice/ File Med Mal (230) | ☐ Wrongful Death (360) | ☐ Possession (450) |
| Warranty (160) | ☐ Other (299) _____ | ☐ Assault/Battery (370) | ☐ Building Code Violation (460) |
| ☐ Employment Discrim (170) | | ☐ Slander/Libel (380) | ☐ Other (499) _____ |
| ☐ Employment (180) | | ☐ Other (399) _____ | |
| ☒ Other (199) <u>Derivative Lawsuit</u> | | | |

| **Inmate Petitions** | **Administrative Law/Relief** | **Judgments/Settlements** | **Appeals** |
|---|---|---|---|
| ☐ PCR (500) | ☐ Reinstate Drv. License (800) | ☐ Death Settlement (700) | ☐ Arbitration (900) |
| ☐ Mandamus (520) | ☐ Judicial Review (810) | ☐ Foreign Judgment (710) | ☐ Magistrate-Civil (910) |

☐ Habeas Corpus (530)
☐ Other (599)
_____

☐ Relief (820)
☐ Permanent Injunction (830)
☐ Forfeiture-Petition (840)
☐ Forfeiture—Consent Order (850)
☐ Other (899)
_____

☐ Magistrate's Judgment (720)
☐ Minor Settlement (730)
☐ Transcript Judgment (740)
☐ Lis Pendens (750)
☐ Transfer of Structured
  Settlement Payment Rights
  Application (760)
☐ Confession of Judgment (770)
☐ Petition for Workers
  Compensation Settlement
  Approval (780)
☐ Other (799) _____

☐ Magistrate-Criminal  (920)
☐ Municipal (930)
☐ Probate Court (940)
☐ SCDOT (950)
☐ Worker's Comp (960)
☐ Zoning Board (970)
☐ Public Service Comm. (990)
☐ Employment Security Comm (991)

☐ Other (999)
_____

**Special/Complex /Other**

☐ Environmental (600)
☐ Automobile Arb. (610)

☐ Medical (620)

☐ Other (699) _____

☐ Sexual Predator (510)
☐ Permanent Restraining Order (680)

☐ Pharmaceuticals (630)
☐ Unfair Trade Practices (640)

☐ Out-of State Depositions (650)

☐ Motion to Quash Subpoena in
  an Out-of-County Action (660)
☐ Pre-Suit Discovery (670)

**Submitting Party Signature:** _____  **Date:** <u>December 13, 2017</u>

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

**Effective January 1, 2016,** Alternative Dispute Resolution (ADR) is mandatory in all counties, pursuant to Supreme Court Order dated November 12, 2015.

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**Pursuant to the ADR Rules, you are required to take the following action(s):**

1. The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action.  If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs.

4. Cases are exempt from ADR only upon the following grounds:

   a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

   b. Requests for temporary relief;

   c. Appeals

   d. Post Conviction relief matters;

   e. Contempt of Court proceedings;

   f. Forfeiture proceedings brought by governmental entities;

   g. Mortgage foreclosures; and

   h. Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5. In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:**       **You must comply with the Supreme Court Rules regarding ADR.**
                       **Failure to do so may affect your case or may result in sanctions.**

STATE OF SOUTH CAROLINA,    )

                                           )

COUNTY OF    RICHLAND    )

                                           )

FIREMEN'S RETIREMENT SYSTEM OF   )
ST. LOUIS, Derivatively on Behalf of
SCANA CORPORATION,

                      Plaintiff,   )

                                           )

vs.                                      )

                                         )

KEVIN B. MARSH, JIMMY E. ADDISON,   )
STEPHEN A. BYRNE, D. MAYBANK
HAGOOD, LYNNE M. MILLER, JAMES
A. BENNETT, MACEO K. SLOAN,
SHARON A. DECKER, JAMES W.
ROQUEMORE, ALFREDO TRUJILLO,
JOHN F.A.V. CECIL, GREGORY E.
ALIFF, JAMES M. MICALI, and HAROLD
C. STOWE

                      Defendants,

         -and-

SCANA CORPORATION, a South Carolina
Corporation,

               Nominal Defendant.

IN THE COURT OF COMMON PLEAS

SUMMONS

FILE NO.

2017 DEC 13 PH 3:30
JEANNETTE W. MCBRIDE
C.C.P. & G.S.
RICHLAND COUNTY
FILED

TO THE DEFENDANT ABOVE-NAMED:

     YOU ARE HEREBY SUMMONED and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the subscriber, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

SCCA 401 (5/02)

Columbia
, South Carolina

Dated: December 13, 2017

_____
Plaintiff/Attorney for Plaintiff

Address:    James M. Griffin
Griffin Davis
1116 Blanding Street, First Floor
Columbia, SC 29201

STATE OF SOUTH CAROLINA

COUNTY OF RICHLAND

IN THE COURT OF COMMON PLEAS
FOR THE FIFTH JUDICIAL CIRCUIT

FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Derivatively on Behalf of SCANA CORPORATION,

     Plaintiff,

  v.

KEVIN B. MARSH, JIMMY E. ADDISON, STEPHEN A. BYRNE, D. MAYBANK HAGOOD, LYNNE M. MILLER, JAMES A. BENNETT, MACEO K. SLOAN, SHARON A. DECKER, JAMES W. ROQUEMORE, ALFREDO TRUJILLO, JOHN F.A.V. CECIL, GREGORY E. ALIFF, JAMES M. MICALI, and HAROLD C. STOWE,

     Defendants,

  -and-

SCANA CORPORATION, a South Carolina corporation,

     Nominal Defendant.

Case No.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

   Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## **NATURE AND SUMMARY OF THE ACTION**

   1.  This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant SCANA Corporation ("SCANA" or the "Company") against certain of its officers and

directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in billions of dollars in damages associated with the Company's abandonment of the construction of two nuclear reactors at SCANA's Virgil C. Summer Nuclear Generating Station ("V.C. Summer") in Fairfield County, South Carolina, as well as to SCANA's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.  SCANA is an energy-based holding company that engages in electric and natural gas utility operations throughout South Carolina, North Carolina, and Georgia. SCANA operates through several wholly-owned subsidiaries, the largest and most significant being South Carolina Energy & Gas ("SCE&G"). SCE&G generates, transmits, distributes, and sells electricity to retail and wholesale customers. According to the Company's most recent Annual Report on Form 10-K filed with the SEC, SCE&G's operating revenues constitute approximately 70% of SCANA's total operating revenues.

3.  SCE&G and South Carolina Public Service Authority ("Santee Cooper"), South Carolina's state-owned electric and water utility, announced a partnership in February 2006 to construct two nuclear reactors at SCANA's V.C. Summer facility in Fairfield County, South Carolina (hereinafter, the "Nuclear Project"). Under the agreement, SCANA owned a 55% stake in the Nuclear Project.

4.  The Nuclear Project was of paramount importance to the Company. With its 55% stake, SCANA's share of the construction costs amounted to well over $5 billion and would be a massive undertaking. Along with Santee Cooper, SCANA partnered with Westinghouse Electric Company LLC ("Westinghouse" or "WEC") as primary contractor, as well as Chicago Bridge &

Iron Company N.V. ("CB&I"), in an agreement signed May 23, 2008. SCANA then presented a cost and construction schedule for the Nuclear Project to the South Carolina Public Service Commission ("SCPSC") in a filing dated May 30, 2008. The Nuclear Project broke ground on March 9, 2013, amid promises that the reactors would come online by 2018.

5.      The Nuclear Project, however, was mired with serious design, construction, and cost headwinds from the beginning. The Individual Defendants (as defined herein) were far from prudent in their oversight of the planning and execution of the Nuclear Project, and actively concealed ongoing construction and management issues, in breach of their fiduciary duty.

6.      SCANA received repeated warnings that the Nuclear Project was plagued by design and management issues. For example, the Company issued a grievance letter in May 2014 signed by defendant Kevin B. Marsh ("Marsh"), SCANA's Chief Executive Officer ("CEO"), to Westinghouse and CB&I that pointed to their ongoing design and management issues causing significant delays and cost overruns with the construction of the reactors. Moreover, the nonpublic letter indicated that Westinghouse had an insufficient plan for the reactor design at the time that construction began, creating a ripple effect that prompted various changes and delays.

7.      Further implicating the Board's awareness, the Board approved an audit of the Nuclear Project in August 2015 from the Bechtel Corporation ("Bechtel"), a large construction and civil engineering firm. Bechtel conducted a thorough assessment of the Nuclear Project, including Westinghouse's design and management of its construction. As internal Santee Cooper documents would later reveal, SCANA and Santee Cooper received a draft of Bechtel's audit as early as November 2015 that demonstrated the Nuclear Project was failing. Bechtel assessed that the construction was behind by two to three years, jeopardizing SCANA's requirement to

- 3 -

complete work by 2020 to remain eligible for $1.4 billion in federal tax credits. Bechtel further provided SCANA with several management integration issues between the Company and its partners due to a "lack of shared vision, goals, and accountability" and "strained" relationships.

8.      Even in the face of these revelations and setbacks, SCANA's fiduciaries created a false impression to investors and state regulators that the project was running smoothly within a reasonable budget and on schedule. As the goals and price continued to shift, the Individual Defendants continued to make false and misleading statements, and omitted material information, about the Nuclear Project's progress to fulfill short-term goals at the expense of long-term integrity. The Individual Defendants refused to make public Bechtel's initial draft audit and actively made efforts to redact or change the report through SCANA's outside counsel. In particular, SCANA's fiduciaries insisted that Bechtel delete criticisms of their oversight of the project and that the Company would not complete work prior to the 2020 deadline in an attempt to leave these critical details out of Bechtel's final report.

9.      On February 5, 2016, Bechtel finally issued a highly-critical 130-page report (the "Bechtel Audit") to SCANA, which the Company had whitewashed by suppressing the most critical findings of the draft Bechtel Audit. As the Nuclear Project was a core component of the Company's future energy output, its progress was or should have been closely monitored by the Individual Defendants. Through the Bechtel Audit, the Individual Defendants were on notice that, among other things, the Nuclear Project suffered from poorly engineered construction plans, faulty designs, inadequate management of contractors, and worker turnover seriously impacting the Company's ability to complete the project on schedule. The Bechtel Audit also provided SCANA's Board of Directors (the "Board") with material issues regarding Westinghouse's lack of transparency to the Company's fiduciaries.

10.     Despite the shortcomings and risks associated with the Nuclear Project revealed to the Board in the Bechtel Audit, the Individual Defendants purposefully concealed the findings throughout 2016 and much of 2017.  Instead, the Individual Defendants continued to issue promotional videos, press releases, and public filings and announcements that created a fundamentally false and misleading impression that the Nuclear Project was running smoothly and had met significant milestones.  These statements also masked that the Individual Defendants had grave concerns about Westinghouse's financial condition and ability to continue constructing the Nuclear Project.

11.     On March 29, 2017, Westinghouse filed for bankruptcy protection, undermining the Company's previous public statements of its primary contractor's financial well-being. Despite this loss, the Company's fiduciaries repeatedly assured investors and the public that the Nuclear Project would be completed on schedule, claiming that the work on the project would continue "without substantial disruption."  The Company further provided slides to the SCPSC that the Nuclear Project was nearing completion.  The reality was that SCANA would not meet any of its deadlines.

12.     This truth emerged on July 31, 2017, when SCANA announced that it was abandoning construction of the Nuclear Project with only 40% of the goals complete.  SCANA finally publicly acknowledged that the Nuclear Project was plagued with delays and cost overruns.  Under South Carolina's Base Load Review Act (the "BLRA"), the Board voted to withdraw SCANA's application with the SCPSC, and sought reimbursement for the Company's costs from its ratepayers through the BLRA as a result of their malfeasance totaling $4.9 billion.

13.     SCANA's abrupt abandonment of the Nuclear Project prompted South Carolina Attorney General Alan Wilson to conduct an investigation into SCANA's role in the Nuclear

Project failure. Further, South Carolina Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project. It was through these efforts that the existence of the Bechtel Audit was finally revealed.

14.    With the revelation that the Bechtel Audit existed, authorities increased their scrutiny of the Company's management of the Nuclear Project prior to its abandonment. After refusing several times to release the Bechtel Audit to the public, South Carolina's Governor, Henry McMaster, finally compelled SCANA to release it in September 2017. The South Carolina House Committee also held a hearing soon after where House members scrutinized SCANA officials for their poor decision-making and management of the Nuclear Project. In an article published by *The Post & Courier*, South Carolina State Representative Russell Ott asserted that the Individual Defendants' concealment of the Bechtel Audit was "a cover up" and "deception at its core." "The bottom line is they lied to everyone and they did it intentionally," Representative Ott stated.

15.    On September 21, 2017, the Company revealed that it had received a subpoena from the U.S. Attorney's Office for the District of South Carolina seeking documents related to SCANA's management of the Nuclear Project. By September 22, 2017, the State Law Enforcement Division ("SLED") had launched a criminal investigation upon request of Attorney General Wilson, focusing on SCANA's concealment of the Bechtel Audit. To make matters worse, on October 17, 2017, the Company announced that it had received a subpoena from the SEC in connection with the Nuclear Project.

16.    Under the BLRA, the Company had the right to seek reimbursement from ratepayers for prudently incurred costs. But with the increased scrutiny over the Company's concealment of the Bechtel Audit, SCANA withdrew its initial application for reimbursement.

In an apparent admission of imprudent expenses incurred in the construction of the Nuclear Project, the Company proposed in a press release on November 16, 2017, to shift the multibillion-dollar bill to its stockholders. Even with the latest proposal, SCANA will still recoup $29.5 million a month from ratepayers to cover the financing costs of the abandoned project over the next fifty years.

17.    In the wake of these revelations, SCANA's stock has plunged almost 40%, or $30.21 per share, erasing more than $4.3 billion in market capitalization from the time the Company received the Bechtel Audit until present. Further, as a direct result of this unlawful course of conduct, the Company is now the subject of numerous state and federal consumer class action and federal securities class action lawsuits on behalf of investors who purchased SCANA's shares. Also, the Company is subject to several ongoing criminal and civil investigations related to the Nuclear Project, including by the South Carolina Attorney General, South Carolina state Senate leaders, the U.S. Attorney's Office in South Carolina, the SEC, and SLED.

18.    While the Company has significantly suffered, the same cannot be said for its fiduciaries. Defendants Marsh, the Company's CEO, and Stephen A. Byrne ("Byrne"), the Chief Operating Officer ("COO"), announced their retirements in the wake of the abandonment of the Nuclear Project. Despite their participation in the wrongdoing, defendants Marsh and Byrne are to receive $20 million in total severance compensation.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over each defendant named herein. SCANA is a South Carolina corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with this County to render the exercise of

jurisdiction by the South Carolina courts permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this Court because defendants Marsh and James A. Bennett ("Bennett") reside in this County.   Additionally, a substantial portion of the transactions and wrongs complained of herein occurred in this County, including the defendants' primary participation in the breaches of fiduciary duty and other legal violations which harmed the Company.   Further, defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## THE PARTIES

**Plaintiff**

21.    Plaintiff Firemen's Retirement System of St. Louis was a stockholder of SCANA at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current SCANA stockholder.

**Nominal Defendant**

22.    Nominal Defendant SCANA is a South Carolina corporation with principal executive offices located at 100 SCANA Parkway, Cayce, South Carolina.   SCANA is an energy-based holding company principally engaged, through subsidiaries, in regulated electric and natural gas utility operations and other nonregulated energy-related businesses in South Carolina, North Carolina, and Georgia.   SCANA does not directly own or operate any significant physical properties, but it directly holds all of the capital stock of its subsidiaries.   SCANA's largest subsidiary, SCE&G, is a regulated public utility that provides electricity and natural gas services to residential, commercial, and industrial customers in South Carolina.   As of December 31, 2016, SCE&G was engaged in the generation, transmission, distribution, and sale of

- 8 -

electricity to approximately 709,000 customers and the purchase, sale, and transportation of natural gas to approximately 358,000 customers. As of February 20, 2017, SCANA and its subsidiaries had approximately 5,910 full-time employees.

**Defendants**

23.    Defendant Marsh is SCANA's CEO, Chairman of the Board, and a director and has been since December 2011 and President and COO and has been since January 2011. Defendant Marsh was also SCANA's Senior Vice President from May 1998 to January 2011; Chief Financial Officer from 1996 to April 2006; President, SCE&G from May 2006 to November 2011; COO, SCE&G from May 2006 to January 2011; and held various positions with the Company or its subsidiaries beginning in 1984. Defendant Marsh is named in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Marsh knowingly, recklessly, or with gross negligence: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Marsh the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2016 | $1,216,901 | $2,902,015 | $1,432,431 | $395,640 | $161,817 | $6,108,804 |

24.    Defendant Jimmy E. Addison ("Addison") is SCANA's Executive Vice President and has been since January 2012; Chief Financial Officer and has been since May 2006; and President and COO, SCANA Energy Marketing, Inc. and has been since May 2014. Defendant Addison was also SCANA's Senior Vice President from May 2006 to January 2012; Vice

President of Finance from August 2001 to May 2006; and held various positions with the Company or its subsidiaries beginning in 1991. Defendant Addison is named in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Addison knowingly, recklessly, or with gross negligence: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Addison the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2016 | $631,619 | $1,054,398 | $619,574 | $194,123 | $81,160 | $2,580,874 |

25.     Defendant Byrne is SCANA's Executive Vice President and has been since 2009 and President, Generation & Transmission and COO, SCE&G and has been since 2011. Defendant Byrne was also Executive Vice President, Generation, Nuclear and Fossil Hydro, SCE&G from 2009 to 2011; Senior Vice President, Generation, Nuclear and Fossil Hydro SCE&G from 2004 to 2009; and held various positions with the Company or its subsidiaries beginning in 1995. Defendant Byrne is named in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Byrne knowingly, recklessly, or with gross negligence: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Byrne the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $631,619 | $1,054,398 | $619,574 | $199,358 | $77,192 | $2,582,141 |

26.     Defendant D. Maybank Hagood ("Hagood") is SCANA's Lead Director and has been since April 2016 and a director and has been since April 1999. Defendant Hagood was also member of SCANA's Nuclear Oversight Committee in at least March 2017 and Chairman of the Audit Committee from at least March 2015 to at least March 2016. Defendant Hagood knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Hagood the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2016 | $101,900 | $123,600 | $225,500 |

27.     Defendant Lynne M. Miller ("Miller") is a SCANA director and has been since April 1997. Defendant Miller was also a member of SCANA's Audit Committee from at least March 2016 to at least March 2017 and Chairman and a member of the Nuclear Oversight Committee in at least March 2015. Defendant Miller knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

28.    Defendant Bennett is a SCANA director and has been since April 1997. Defendant Bennet was also a member of SCANA's Audit Committee in at least March 2017 and a member of the Nuclear Oversight Committee from at least March 2015 to at least March 2016. Defendant Bennett knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse.  SCANA paid defendant Bennett the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | Total |
|---|---|---|---|---|
| 2016 | $88,400 | $123,600 | $3,867 | $215,867 |

29.    Defendant Maceo K. Sloan ("Sloan") is a SCANA director and has been since April 1997.  Defendant Sloan was also a member of SCANA's Nuclear Oversight Committee from at least March 2016 to at least March 2017 and a member of the Audit Committee in at least March 2015.  Defendant Sloan knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse.  SCANA paid defendant Sloan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $86,400 | $123,600 | $210,000 |

30.     Defendant Sharon A. Decker ("Decker") is a SCANA director and has been since October 2015.  Defendant Decker was also a SCANA director from December 2005 to April 2013.  Defendant Decker was a member of SCANA's Nuclear Oversight Committee in at least March 2017.  Defendant Decker knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse.  SCANA paid defendant Decker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

31.     Defendant James W. Roquemore ("Roquemore") is a SCANA director and has been since and has been since December 2007.  Defendant Roquemore was also Chairman of SCANA's Nuclear Oversight Committee from at least March 2016 to at least March 2017 and a member of that committee from at least March 2015 to at least March 2017.  Defendant Roquemore knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse.  SCANA paid defendant Roquemore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $92,400 | $123,600 | $216,000 |

- 13 -

32.    Defendant Alfredo Trujillo ("Trujillo") is a SCANA director and has been since October 2013.    Defendant Trujillo was also a member of SCANA's Nuclear Oversight Committee from at least March 2015 to at least March 2017.  Defendant Trujillo knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse.  SCANA paid defendant Trujillo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

33.    Defendant John F.A.V. Cecil ("Cecil") is a SCANA director and has been since October 2013.  Defendant Cecil was also a member of SCANA's Audit Committee from at least March 2015 to at least March 2017.  Defendant Cecil knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse.  SCANA paid defendant Cecil the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

34.    Defendant Gregory E. Aliff ("Aliff") is a SCANA director and has been since October 2015.  Defendant Aliff was also Chairman of SCANA's Audit Committee in at least March 2017 and a member of that committee from January 2016 to at least March 2017.

Defendant Aliff knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Aliff the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $89,900 | $123,600 | $213,500 |

35.    Defendant James M. Micali ("Micali") was a SCANA director from December 2007 to April 2017. Defendant Micali was also a member of SCANA's Audit Committee from at least March 2015 to at least March 2017. Defendant Micali knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Micali the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $91,400 | $123,600 | $215,000 |

36.    Defendant Harold C. Stowe ("Stowe") was SCANA's Lead Director from April 2013 to April 2016 and a director from April 1999 to April 2016. Defendant Stowe was also a member of SCANA's Audit Committee from at least March 2015 to at least March 2016. Defendant Stowe knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's

primary contractor, Westinghouse.  SCANA paid defendant Stowe the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $47,600 | $57,900 | $105,500 |

37.    The defendants identified in ¶¶23-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶23, 26-36 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶26-28, 33-36 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶26-32 are referred to herein as the "Nuclear Oversight Committee Defendants."  Collectively, the defendants identified in ¶¶23-36 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

38.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe SCANA and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SCANA in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of SCANA and not in furtherance of their personal interest or benefit.

39.    To discharge their duties, the officers and directors of SCANA were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of SCANA were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)     remain informed as to how SCANA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(c)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive or fraudulent conduct.

**SCANA's Code of Conduct and Ethics**

40.     The Company implemented a Code of Conduct and Ethics (the "Code of Conduct").  The Code of Conduct applies to all directors, officers, and employees of the Company.  Each person covered by the Code of Conduct must certify to his or her receipt and understanding of his or her obligations under the Code of Conduct.  As to lawful and ethical behavior, the Code of Conduct states:

### EXPECTATIONS OF PROFESSIONAL CONDUCT

It is our personal responsibility to uphold the Code of Conduct & Ethics each and every day.  Resources are available to help you understand the Company's expectations.  If you have a concern, talk about it with someone who is in a position to help you.  Report any conduct that is contrary to our SACRED Values.

Expectations of professional conduct apply to all employees, contractors, Board members or agents of SCANA. High standards of honesty, respect for the law and integrity are essential in carrying out SCANA's business.  They are also essential if we are to maintain the confidence of our customers and the communities we serve.

**As an employee, contractor, Board member or agent of SCANA, you must:**

• Abide by SCANA's Code of Conduct & Ethics;

• Behave honestly and avoid illegal, unethical or improper conduct;

• Be helpful, respectful and cooperative toward co-workers, customers, suppliers and the general public;

• Have a practical working knowledge of the policies, laws and regulations affecting your job responsibilities;

• Seek guidance from your supervisor, manager or a Company officer when in doubt about your responsibilities or the application of a policy;

• Report any actual or suspected violation of a law, rule or regulation through your management chain or other available reporting resources.  If the concern is related to accounting, internal controls, auditing matters or financial reporting irregularities, contact the Corporate Compliance & Privacy Officer;

• Cooperate with any investigation of alleged wrongdoing;

• Be aware of the appearance of wrongdoing.

**Additionally, if you are a member of SCANA management, you must:**

• Be an ethical leader;

• Monitor and ensure your employees attend required compliance training, abide by the Code, and comply with laws, policies and regulations;

• Take appropriate actions to prevent conduct at work that creates an intimidating, hostile or offensive work environment, or makes employees uncomfortable;

• Promptly and properly address situations before they escalate;

• Ensure systems and procedures are in place to protect Company assets and legally achieve Company goals.

41.     The Code of Conduct requires accurate and truthful conduct when transacting with government entities, stating:

**GOVERNMENT TRANSACTIONS**

**POSITION STATEMENT**

SCANA is committed to compliance with all applicable federal, state or local laws and regulations when conducting its business.

**EXPECTATION**

SCANA is a family of companies that complies with all rules and regulations set by federal, state and local authorities where we do business. You are responsible for understanding the laws, rules and regulations that apply to your job. SCANA and its employees may be subject to substantial penalties and/or criminal punishment for non-compliance with regulations.

Laws and regulations applicable to transactions with government entities contain special rules that are stringent. Be accurate and truthful in the preparation, review and submission of records, reports and other information. It is a crime to knowingly make a false statement or representation to a government official or agency. Any inquiries from government officials regarding SCANA's business activities should be reported to your management and/or SCANA's Legal Department immediately.

**Additional Duties of the Audit Committee Defendants**

42.     In additional to the above duties, the Audit Committee Defendants, defendants Aliff, Bennett, Cecil, Hagood, Micali, Miller, and Stowe, owed specific duties to SCANA to assist the Board in overseeing the integrity of SCANA's financial statements. The Audit Committee Charter further provides that the Audit Committee must oversee the Company's compliance with legal and regulatory requirements. The Audit Committee is also charged with reviewing the "status of significant risk(s) for which oversight" and reviewing "at least annually SCANA's Corporate Risk Management program, its scope and effectiveness, and any other SCANA policies with respect to risk assessment and risk management." The Audit Committee must also discuss "SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures." The Audit Committee met quarterly throughout the relevant period. The Audit Committee Charter states:

> **Duties and Responsibilities**
>
> *   *   *
>
> •   As appropriate or required, meet periodically and separately, with management, SCANA's General Counsel, the external auditors, Corporate Compliance and Audit Services, and the Risk Management Officer;

* * *

- Review at least annually SCANA's Corporate Risk Management program, its scope and effectiveness, and any other SCANA policies with respect to risk assessment and risk management;

- Review the status of significant risk(s) for which oversight is assigned to the Committee by the Board of Directors;

- Discuss SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures;

* * *

- Review with any disclosure committee of SCANA the effectiveness of SCANA's disclosure controls and procedures;

* * *

- Review with the external auditors their opinion on management's assessment of the effectiveness of internal control over financial reporting;

- Review and discuss with management and the external auditors the annual audited financial statements, including the disclosures to be made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board the inclusion of the audited financial statements in the Form 10-K, if appropriate;

- Review and discuss with management and the external auditors the quarterly financial statements, including disclosures to be made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of each Form 10-Q, including the results of the external auditors' review of the quarterly financial statements;

* * *

- Review all reports required to be submitted by the external auditors to the Committee under Section 10A(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), which requires that the external auditors inform the Committee of illegal acts that have been detected or otherwise come to the attention of the external auditors in the course of the audit, and require senior management to take timely and appropriate remedial action with respect to such illegal acts;

* * *

- Review reports from Corporate Compliance and Internal Auditing regarding SCANA's conformity with applicable legal requirements and its Code(s) of Conduct;

- Review with the Board any issues that arise with respect to the quality or integrity of SCANA's financial statements, its compliance with legal, regulatory, or ethical requirements, the performance and independence of its external auditors or the performance of Audit Services;

\* \* \*

- Establish procedures for the receipt, retention and treatment of complaints received by SCANA regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

\* \* \*

- Review and assess annually the adequacy of the Committee's Charter and recommend to the Board any improvements to the Charter that the Committee deems to be necessary or appropriate; and

- Conduct an annual performance evaluation to compare the performance of the Committee to the requirements of this Charter and any other duties or responsibilities delegated to the Committee by the Board, and report to the Board the results of the evaluation, which may take the form of an oral presentation by a member of the Committee to the Board.

**Additional Duties of the Nuclear Oversight Committee Defendants**

43.     The Nuclear Oversight Committee Defendants, defendants Bennett, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo, are charged with oversight of the Company's nuclear power operations.  Meeting quarterly, the Nuclear Oversight Committee must monitor, discuss, and evaluate SCANA's nuclear operations, "which include regulatory matters, operating results, training and other related topics."  According to the Company's 2017 Proxy Statement on Form 14A filed with the SEC, the Nuclear Oversight Committee Defendants periodically toured V.C. Summer and its training facilities.   "Additionally, the Committee routinely presents an independent report to the Board on the status of [SCANA's] operations."

**Control, Access, and Authority**

44.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of SCANA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

45.    Because of their advisory, executive, managerial, and directorial positions with SCANA, each of the Individual Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of SCANA, including information regarding the several factors negatively impacting the Company's performance.

46.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SCANA, and was at all times acting within the course and scope of such agency.

**Breaches of Duties**

47.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of SCANA, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

48.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making

improper statements to the public and SCANA's stockholders, improper practices that wasted the Company's assets, and caused SCANA to incur substantial damage.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of SCANA, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, SCANA has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to SCANA's Nuclear Project that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of SCANA, regarding the Individual Defendants' management of SCANA's operations and the Nuclear Project's estimated cost and timeline; and (iii) enhance the Individual Defendants' executive and directorial positions at SCANA and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of

this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

53.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### THE NUCLEAR PROJECT IS MIRED IN DESIGN FLAWS, CONSTRUCTION DELAYS, AND COST OVERRUNS

**Background of the Nuclear Project**

56.     SCANA is a South Carolina corporation created as a holding company.  It holds directly all of the capital stock of its subsidiaries.  Primary among its subsidiaries is SCE&G, which engages in the "generation, transmission, distribution and sale of electricity to approximately 709,000 customers and the purchase, sale and transportation of natural gas to approximately 358,000 customers (each as of December 31, 2016)" according to the Company's most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC on February 24, 2017 (the "2016 Form 10-K").  "SCE&G's electric service territory extends into 24 counties covering nearly 16,000 square miles in the central, southern and southwestern portions of South Carolina."

57.     Beginning in at least 2006, SCANA began significant lobbying efforts with the South Carolina Legislature to pass the BLRA.  On information and belief, this lobbying effort cost the Company millions of dollars, and focused on persuading legislators that South Carolina ratepayers should foot the bill for any cost overruns for the Nuclear Project.  The South Carolina Legislature adopted the BLRA on May 3, 2007.  The BLRA provided a blank check to SCANA, allowing the Company to raise electric rates in South Carolina to fund the construction of the Nuclear Project if it went over budget or fell behind schedule.

58.     An article dated September 2, 2017, published by *The Post and Courier*, noted that "[a]ll but one of the 32 lawmakers investigating the demise of the V.C. Summer nuclear project have taken campaign contributions from the utility [SCANA] responsible for building it, highlighting the extent of the power industry's efforts in Columbia."  The article linked the lobbying efforts to the fast tracking of the BLRA in 2007 "a law that broke tradition and allowed private utilities — SCE&G in this instance — to bill customers for power plants before they're completed."

59.     The BLRA is not completely without oversight. While the BLRA establishes SCANA's right to recover prudently incurred development costs in the event of abandonment, the SCPSC determines whether a utility has accrued those costs prudently at the time of abandonment.

60.     By 2008, SCANA's subsidiary, SCE&G began the process of obtaining construction and operating licensing for two 1,117 megawatt nuclear electric-generating units at V.C. Summer in Fairfield County, South Carolina, with the SCPSC and the U.S. Nuclear Regulatory Commission. SCE&G partnered with Santee Cooper, a state-owned utility in South Carolina, in a joint venture for the planning and construction of the Nuclear Project. SCANA, through SCE&G, was 55% responsible for the joint venture. SCE&G and Santee Cooper commissioned Westinghouse, a subsidiary of Toshiba Corporation ("Toshiba"), to be primary designer and contractor, and CB&I (collectively, the "Consortium") for the building of the two nuclear plants under an engineering, procurement, and construction ("EPC") contract.

61.     SCANA, through SCE&G, filed a combined application on May 30, 2008, for a Certificate of Environmental Compatibility, Public Convenience and Necessity, and for a Base Load Review Order, with the SCPSC and the South Carolina Office of Regulatory Staff ("ORS") under the BLRA. According to a press release issued by the Company that same day, SCANA's share of the cost of construction would amount to $5.4 billion. SCANA stated that Unit 2 would come online in 2016, and Unit 3 in 2019. The Nuclear Project finally broke ground in March 2013, but was still plagued by construction delays and cost increases.

62.     In 2016, V.C. Summer's preexisting Unit 1 provided approximately 5.8 million megawatt hours, representing 25% of SCANA's total energy generation through SCE&G. With the construction and supposed completion of Units 2 and 3, the Company boasted that its energy

generating capacity and the percentage of total generating capacity represented by nuclear sources would greatly increase. SCANA stated in its 2016 Form 10-K that SCANA would be retiring many coal-fired plants, and adding renewable, nuclear energy to replace this segment. By 2021, the Company projected that approximately 56.7% of its generated energy would come from nuclear power, emphasizing the importance that the Nuclear Project held as part of the Company's overall strategy.

**The Nuclear Project Is Delayed Due to Known Construction, Cost, and Management Issues**

63.    On March 2, 2009, the SCPSC approved the EPC contract and construction schedules provided by SCANA. The construction of the Nuclear Project, however, was fraught with known construction delays, cost increases, and issues with Westinghouse's management from the beginning. On several occasions, SCANA sought approval from the SCPSC for cost increases totaling approximately $2 billion in additional construction costs, as well as scheduling delays of up to three years.

64.    The first cost increase came in November 2010. At this time, SCANA submitted a petition to the SCPSC to increase its capital cost forecast for the Nuclear Project by $174 million, which SCPSC approved.

65.    The Company requested and received another capital cost forecast increase from the SCPSC of $283 million in May 2012. The request also included a delay of the construction schedule for Unit 2 until March 15, 2017, and an acceleration of the construction of Unit 3 to May 15, 2018.

66.    Company fiduciaries were aware of Westinghouse and CB&I poor management of the Nuclear Project as early as at least 2014. An internal letter from defendant Marsh dated May 6, 2014, to executives at Westinghouse and CB&I, aired SCANA's grievances regarding

Westinghouse's ongoing failures under the EPC contract (the "May 2014 Grievance Letter"). Among these issues not shared with the public, SCANA noted that design issues contributed to ongoing project delays which had "tested [SCANA's] resolve." Defendant Marsh also pointed to high executive turnover since the project began in May 2008, as well as major litigation that Westinghouse had become embroiled in due to EPC agreements with two other utilities which had overextended the contractor. He further noted that there was an "evident deterioration" of the relationship between senior management within the Consortium, and that management was "less focused and seem[ed] intent on taking advantage of [SCANA's] cooperative nature."

67.     The May 2014 Grievance Letter also pointed to design issues that the Company asserted "contributed to the project delay." Specifically, defendant Marsh identified the delayed completion of Issued For Construction ("IFC") drawings. According to the May 2014 Grievance Letter, the Company was advised that the Consortium had design delays in May 2012, when Westinghouse informed the Company that it would not meet the October 11, 2012 schedule for many of the IFC packages. While Westinghouse then initially reported 94% completion of the IFC documents in December 2013, Westinghouse backtracked on March 31, 2014, when the contractor reported that the IFC documents were only 88% complete. Westinghouse's many design changes adversely impacted the structural and civil work on the Nuclear Project, as well as multiple license amendment requests.

68.     Despite Westinghouse's shortcomings and the attendant risk, SCANA continued its relationship with the contractor in the face of continued delays and cost overruns. Reports in the media pointed to flaws in the design that created delays downstream. An article published by *The Associated Press* in July 2014 entitled "Promises of Easier Nuclear Construction Fall Short" stated that analysts found the designs "were hard or impossible to make." The article's author

consulted engineers to assess the Nuclear Project's progress and found that "[u]tility companies [including SCANA] got early warnings but proved unable to avoid the problems."

69.     The rising costs and increasing delays affected SCANA's ability to capitalize on its return on capital.  In June 2015, the ORS and South Carolina's Energy Users Committee agreed to no longer challenge SCANA's changes to its construction and capital cost forecasts in exchanged for a return on capital rate reduction from 11% to 10.5%, affecting the Company's future operating revenues.

70.     In September 2015, SCANA sought and received from the SCPSC an increase in its capital cost forecast of $698 million.  This submission was accompanied by a construction scheduling delay until January 19, 2019 for Unit 2 and June 16, 2020 for Unit 3.

71.     In October 2015, Fluor Corporation ("Fluor"), a global engineering and construction firm, replaced CB&I as a subcontractor.  On October 27, 2015, SCE&G, Santee Cooper, and the Consortium amended the EPC contract, effective in December 2015.  As part of the agreement, Westinghouse engaged Fluor as its subcontracted construction manager.

72.     Again in May 2016, the Company requested and received permission to enter a fixed price contract with Westinghouse that included an additional $832 million in its capital cost forecast.  SCANA also sought to extend the completion date of the Nuclear Project once again, with Unit 2 to be completed August 3, 2019, and Unit 3 to August 31, 2020.

73.     Internal Santee Cooper documents obtained by *The State* demonstrated that SCANA officials, including defendant Marsh, knew that SCANA needed to overhaul the management of the Nuclear Project.  The article dated September 7, 2017, entitled "SCE&G Failed to Heed Santee Cooper Warnings at Bungled Nuke Project, Records Show," pointed to a June 18, 2016 email from non-defendant Santee Cooper executive Lonnie Carter to defendant

Marsh. Based on studies conducted in 2015, non-defendant Carter conveyed to defendant Marsh the need for "onboard experts to help work on key issues and improve management of the project." By November 2016, non-defendant Carter emailed to defendant Marsh that "SCANA's project management team ... does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities." Non-defendant Carter further reiterated the need to hire an outside manager and asked defendant Marsh "why this has not yet been done."

74.    The Board was also aware that Westinghouse's management of the Nuclear Project was in danger due to the contractor's impending bankruptcy. Internal documents uncovered by *The State* cited in its September 7, 2017 article revealed that on March 21, 2016, the Company's Board met with Santee Cooper's Board to discuss how the possibility of Westinghouse's bankruptcy risked the completion of the Nuclear Project. The article noted that Santee Cooper pushed at this time to retain an outside bankruptcy lawyer due to concerns about the financial health of Westinghouse and its parent, Toshiba. This was a full year before Westinghouse officially declared bankruptcy, yet the Board took no action.

75.    An article in *The Post and Courier* addressed the May 2016 cost overruns and construction delays associated with the Nuclear Project. The article focused on ratepayers' concerns that they would be strapped with the costs of these overruns. The article stated:

> Did you know that South Carolina law allows utility companies to charge consumers more for cost overruns on big projects like building a nuclear power plant?
>
> It sounds shocking, but the Office of Regulatory Staff (ORS) just published a report showing that SCE&G V.C. Summer project has cost $1.5 billion more than originally estimated.
>
> And guess who is footing the bill? South Carolina consumers, many of whom live on modest incomes and cannot afford these additional costs.

- 30 -

AARP South Carolina continues to raise concerns about the cost overruns that have resulted during the current SCE&G capital improvement projects. The most serious questions we raised about the state regulations that allow SCE&G to charge consumers for cost overruns remain unanswered.

\* \* \*

Consumers should not be forced to continue paying good money after bad, if in fact there is a better alternative. Is there an opportunity for an analysis to determine alternatives?

Why should utilities like SCE&G even try and control costs on power plant projects, since the financial risk is borne by consumers and not the company?

In addition, why is there no provision to allow for refunds or rebates to consumers if a project goes bad?

With every passing year, as the V.C. Summer project grows more expensive, these questions become more urgent. Consumers should not be forced to continue paying their hard-earned money with no end in sight.

AARP urges the ORS to remember the best interests of everyday South Carolinians, maintain close oversight of this project, and address our areas of concern in a timely manner.

76.    The worsening financial condition of Westinghouse and its impact on the Nuclear Project caught the attention of industry analysts. In June 2016, Morgan Stanley downgraded the Company's stock rating from "equal weight" to "underweight," an indication that SCANA was expected to underperform other companies within the industry. The rating change was tied to concerns that if Toshiba's and Westinghouse's financial condition continued to worsen, Westinghouse would not be able to honor the terms of the EPC with SCANA and default on its obligations to complete the Nuclear Project.

77.    By February 2017, Westinghouse's potential financial collapse that SCANA left unaddressed became a practical inevitability. On February 14, 2017, Toshiba, parent of Westinghouse, announced a delay in the release of its quarterly earnings report due to its concerns over its accounting controls over Westinghouse. In particular, Toshiba estimated that it

would need to write down $6.3 billion related to the Nuclear Project. Toshiba's Chairman at the time, Shigenori Shiga, resigned in the wake of this massive write-down.

78.    That same day, February 14, 2017, SCANA issued a revised completion schedule for the Nuclear Project yet again. This shift was substantial: Unit 2 would now not be completed until April 2020, and Unit 3 not until December 2020.

**The Bechtel Audit Further Alerts the Individual Defendants to Ongoing Construction, Cost, and Management Issues with the Nuclear Project**

79.    In the midst of mounting delays and cost overruns, Santee Cooper's management began to urge SCANA to hire Bechtel to perform a comprehensive assessment of the Nuclear Project to mitigate these issues. In April 2015, SCANA and Santee Cooper met with the engineering firm Bechtel to evaluate the engineering firm's proposal for its Audit. Defendant Marsh agreed to seek the Board's approval of Bechtel as auditor. By August 6, 2015, SCANA and Bechtel had signed an agreement for Bechtel to perform its audit by the end of 2015 at a cost of $1 million, an agreement approved by the Board.

80.    Through the assessment provided by Bechtel in its draft Audit, SCANA and the Board were on notice that the Nuclear Project schedule was at significant risk of non-completion. Bechtel completed the first draft of its initial findings as early as October 22, 2015. Bechtel then delivered the draft Audit report to SCANA on November 9, 2015. The draft Audit stated that "the current schedule is at risk," listing several significant issues pushing the completion dates for Units 2 and 3 well past the 2020 date. According to the draft Audit, "to-go scope, quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast," pushing the completion date of both Units to June 2023. This critical reassessment jeopardized SCANA's ability to receive the $1.4 billion in federal tax credits needed to finance the project.

81.    In addition to an overall assessment that the Nuclear Project would not be completed by the dates SCANA provided to the regulators and the public, Bechtel's draft Audit contained a comprehensive list of shortcomings and risks plaguing the operation.  Bechtel pointed to a lack of project management, plans and schedules that did not reflect reality, and strained relations between the parties within the Consortium, among other things.  The draft Bechtel Audit stated:

- The to-go scope quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast.

- While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

- The Consortium lacks the project management integration needed for a successful project.

- There is a lack of shared vision, goals, and accountability between the Owners and the Consortium.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The detailed engineering design is not yet completed which will subsequently affect the performance of procurement and construction.

- The issued design is often not constructible resulting in a significant number of changes and causing delays.

- The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation.

- The relationship between the Consortium partners (Westinghouse Electric Company (WEC) and Chicago Bridge & Iron (CB&I)) is strained, caused to a large extent by commercial issues.

82.    The problems that Bechtel noted required action by SCANA's management and Board.  Instead of addressing these problems, the Individual Defendants actively sought to suppress the more critical findings prior to the final Audit's release in February 2016.  Having

obtained a copy of the draft Audit in November 2017, *The Post & Courier* revealed in an article entitled "Insight that Would've Alerted Problems with Nuclear Project Scrubbed from Audit Two Years Ago" that SCANA's fiduciaries sought to delete Bechtel's more critical analysis. According to the article, SCANA hired non-defendant attorney George Wenick "to battle with Bechtel over what would be included in the final document." According to internal Santee Cooper documents, SCANA wanted Bechtel to remove criticisms of the Company's lack of oversight of the project and the push back of the 2020 deadline.

83.     As detailed herein, SCANA continued to assure regulators, ratepayers, and the investing public that there was significant progress being made on the Nuclear Project and that the Units would be completed by the 2020 deadline. But as the chief counsel of the ORS non-defendant Jeff Nelson would later state upon revelations that SCANA was abandoning the project, "[t]here was information that was withheld from us and the Public Service Commission" as far back as 2015.

84.     Specifically, more than 30 pages disappeared from the final Bechtel Audit, delivered by Bechtel to SCANA on February 5, 2016. Still scathing in its assessment, the final Bechtel Audit focused on ongoing issues with SCANA's primary contractor, Westinghouse. According to Bechtel's auditors, Westinghouse did not have a reasonable construction schedule, used a reactor design that was not constructible, and employed subcontractors who did not have commercial motivation to complete the Nuclear Project, among other things. The Bechtel Audit stated:

> [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success:
>
> - …[T]he plans and schedules are not reflective of actual project circumstances

- The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance

- The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis

- There is a lack of a shared vision, goals, and accountability between Owners and the Consortium

- The Consortium lacks the project management integration needed for a successful project outcome

- The WEC-CB&I relationship is strained, caused to a large extent by commercial issues

- The overall morale on the project is low

- The Contract does not appear to be serving the Owners or the Consortium particularly well

- The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize the impacts

- There is significant engineering and licensing workload remaining (currently over 800 engineers) [Inspections, Tests, Analyses, and Acceptance Criteria] closure will be a significant effort

- Emergent issues potentially requiring [Nuclear Regulatory Commission] approval of [License Amendment Requests] remain a significant project concern

- There is a significant disconnect between construction need dates and procurement delivery dates

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program

- Construction productivity is poor for various reasons including changes needed to the design, sustained overtime, complicated work packages, aging workforce, etc.

- The indirect to direct craft ratio is high

- Field non-manual turnover is high

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance

- The schedule for the startup test program is in the early stages of development.    The [Boundary Identification Package] turnover rate appears to be overly aggressive

85.    On or about mid-February 2016, an internal Santee Cooper memorandum indicated that SCANA officials expressed concern about whether the release of the Bechtel Audit would subject the Company's officers and directors to a stockholder suit.  The Columbia, South Carolina, news site *TheState.com* later obtained the memo entitled "Bechtel Report Action Plan," and published its contents in an article entitled "Confidential Memo Shows SCANA, Santee Cooper Long Worried Over Nuclear Woes."  The article reported that "[s]ome 20 months before a report critical of the failing V.C. Summer nuclear project became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper."  The article notes that SCE&G officials were "specifically aware of problems raised in [the] report," noting that failure to act could result in officer and director liability.  The memo also states that SCANA "wanted to know what kind of disclosures they should make to prospective buyers of their corporate debt, given they … knew the nuclear project had serious troubles."  Moreover, the memo also revealed that SCANA officials were aware the ORS "was trying to find out about the Bechtel report," but the information in the Audit remained concealed from ORS authorities, with SCANA denying its existence.  South Carolina Representative James E. Smith, Jr. was quoted in the article stating that the Santee Cooper memo showed that SCANA "could no longer have plausible deniability, to say they didn't know what was going on."

86.    The Individual Defendants knew or were reckless in not knowing about the problems associated with the Nuclear Project that the Bechtel Audit brought to light.  The

Nuclear Project, which included the expansion of a preexisting nuclear plant at the Company's V.C. Summer facility, was a key aspect of SCANA's plan to expand its nuclear energy generating capabilities. Therefore, the Nuclear Project was a core component of the Company's future energy output, and its progress was or should have been closely monitored by the Individual Defendants.

87.    As explained in the Company's 2017 Proxy Statement on Form DEF 14A, filed with the SEC on March 24, 2017, "risk oversight is … thoroughly interwoven into the direction of the Board." The Nuclear Project, and the billions of dollars the Company poured into it, was a significant risk to SCANA. Further, because primary contractor Westinghouse's operational performance and financial stability were tied to when Units 2 and 3 would become operational, the schedule for completing the Nuclear Project and matters affecting that schedule, including those surrounding Westinghouse, were likewise significant risks to the Company requiring the Board's diligent oversight.

88.    To assist in the Board's duty of risk oversight, the Board established an executive senior officer-level Risk Management Committee reporting directly to the Audit Committee. The Risk Management Committee regularly conducts scheduled meetings wherein the Committee receives presentations from management representatives pertaining to risks of a particular operation, including the Nuclear Project. Among the topics of risk presented to the Audit Committee through the Risk Management Committee was likely the critical analysis provided in the Bechtel Audit regarding the status of the Nuclear Project. It is the duty of the Audit Committee to "[r]eview the status of significant risk(s) for which oversight is assigned to the Committee by the Board," "[d]iscuss SCANA's major financial risk exposures and the steps

management has taken to monitor and control such exposures," and report these risks to the Board.

89.    Moreover, the Nuclear Oversight Committee was charged with monitoring, discussing, and evaluating SCANA's nuclear operations, "which include regulatory matters, operating results, training and other related topics." The Nuclear Project and the status of its construction and attendant cost was at the forefront of the Company's nuclear operations, with over 56% of all the Company's generated energy provided coming from the Units at V.C. Summer by 2021. The Nuclear Oversight Committee had a duty to oversee and monitor any status of the Nuclear Project, including those revealed in the Bechtel Audit.

90.    The matters discussed in the Bechtel Audit were all red flags that the schedule for building the Nuclear Project was impossible to meet in the timeframe reported to the public and state regulators, that the projected costs associated with the Nuclear Project were unrealistic, and that SCANA was not complying with applicable laws in the design and construction of the Nuclear Project. These warnings went to the highest level of management, including the Company's CEO, defendant Marsh. The members of the Board either knew about these red flags and failed to act or consciously failed to take appropriate steps to learn about them. Under either scenario, the members of the Board breached their fiduciary duty of loyalty to the Company.

## IMPROPER STATEMENTS

### Individual Defendants' Improper Statements Prior to the Bechtel Audit

91.    Before the issuance of the Bechtel Audit, the Individual Defendants made repeated improper statements about the cost, progress, and completion schedule of the Nuclear Project at V.C. Summer. The Individual Defendants had no reasonable basis to make the positive claims in the SCANA's public filings and announcements in the face of construction

delays and cost overruns. In truth, the Board and officers of SCANA failed in their duty to oversee the operation of the Nuclear Project. In particular, the Individual Defendants were in breach of their fiduciary duty by concealing flaws related to project mismanagement and a lack of a constructible design that would ultimately doom the Nuclear Project. For example, the Company fiduciaries, including defendant Marsh, were aware of ongoing design and management issues with Westinghouse and CB&I causing significant delays and cost overruns with the construction of the reactors, as evidenced by the May 2014 Grievance Letter.

92.    On February 19, 2015, the Individual Defendants caused or allowed the Company to issue a press release announcing the financial results for the fourth fiscal quarter and the full fiscal year 2014. The press release touted "major accomplishments" for the Nuclear Project, "such as the placement of the Unit 2 module CA20, the first ring of the Unit 2 containment vessel, the Unit 2 module CA05, and the containment vessel bottom head for Unit 3." The press release also boasted that customers would realize $1.2 billion in interest savings in rates for planned issuances. The press release stated:

> **New Nuclear**
>
> Progress continues on V.C. Summer Units 2 and 3. 2014 marked some major accomplishments for the project such as the placement of the Unit 2 module CA20, the first ring of the Unit 2 containment vessel, the Unit 2 module CA05, and the containment vessel bottom head for Unit 3. Escalation continues to run below original expectations and due to the historically low interest rate environment over the last several years, customers will realize approximately $700 million in interest savings over the life of the debt issued to support the financing as the weighted average rate has been 4.99%, compared to the original estimate of 6.43%. Additionally, SCE&G has locked in rates for planned issuances over the next two years which will likely generate an additional $525 million in savings over the life of those issuances. In total, this equates to approximately $1.2 billion in interest savings that will be realized by our customers.

93.    On February 27, 2015, the Company filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2014 (the "2014 Form 10-K") with the SEC, providing the

Company's financial results and position. The 2014 Form 10-K was signed by defendants Marsh, Addison, Bennett, Cecil, Hagood, Micali, Miller, Roquemore, Sloan, Stowe, and Trujillo. These defendants omitted or failed to disclose that the Nuclear Project was mired in design flaws, construction delays, and cost overruns.

94.    The 2014 Form 10-K contained certifications by defendants Marsh and Addison pursuant to sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("SOX") that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

95.    In a March 12, 2015 press release, defendant Marsh claimed that "[s]ubstantial progress has been made towards the completion of the units," despite an increase in the capital cost in the Nuclear Project. Further touting the progress, he stated: "eighty five percent of the major equipment for Unit 2 has been received on site, the containment vessel bottom heads of both units have been set, and all three of the steel rings that comprise the vertical walls of the Unit 2 containment vessel have been completed or are near completion. Also, the first ring for Unit 2 has been set in place and a total of twenty three million man-hours have been worked with an excellent safety record."

96.    On January 19, 2016, the Individual Defendants caused or allowed the Company to release a video entitled "Highlighting a Year of Progress for V.C. Summer Units 2 and 3" discussing the progress of the Nuclear Project. In the video, the Company claimed that the Nuclear Project was moving along successfully and the "construction team concluded the year on a high note."

97.     On the same day, January 19, 2016, SCANA issued a press release.  In the press release, the Company touted the "achievement" of several "milestones" for the Nuclear Project. The Company further claimed that "mechanical modules were also taking shape" while "work continued steadily on the construction site."

**Individual Defendants' Continued Improper Statements and Concealment After the Bechtel Audit**

98.     Despite receiving the Bechtel Audit, the Individual Defendants continued to make improper statements about the cost, progress, and completion schedule of the Nuclear Project. Moreover, the Individual Defendants actively concealed the contents of the Bechtel Audit from state regulatory authorities, ratepayers, and the investing public until compelled to release it by South Carolina Governor Henry McMaster in September 2017.

99.     On February 26, 2016, the Company filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2015 (the "2015 Form 10-K") with the SEC, providing the Company's financial results and position.  The 2015 Form 10-K was signed by defendants Marsh, Addison, Aliff, Bennett, Cecil, Decker, Hagood, Micali, Miller, Roquemore, Sloan, Stowe, and Trujillo.  These defendants omitted or failed to disclose the results of the Bechtel Audit, that the Nuclear Project was mired in design flaws and cost overruns, and that there was serious concern about the financial health of the Nuclear Project's primary contractor, Westinghouse.  Instead, the 2015 Form 10-K stated that the new reactors were "used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates."  The 2015 Form 10-K also reported that the total estimated project cost ranged from $7.1 billion to $7.6 billion, that Unit 2 would be completed by August 2019, and Unit 3 by August 2020, despite having no basis for this claim given the Bechtel Audit's findings.

100.    The 2015 Form 10-K contained certifications by defendants Marsh and Addison pursuant to SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

101.    On March 28, 2016, in a letter addressed to SCANA stockholders enclosed within SCANA's 2016 Proxy Statement materials, defendant Marsh continued to make false and misleading claims about the progress of the Nuclear Project despite his knowledge of the Bechtel Audit. In the letter, defendant Marsh claimed that SCANA "continued to move forward and make substantial progress on initiatives important to [the] company such as [its] new nuclear construction project."

102.    On April 28, 2016, SCANA held a conference call for analysts and investors to discuss the Company's first fiscal quarter 2016 earnings and operations. During the conference call, defendant Byrne assured the public that the Consortium was "doing a tremendous job" and that progress was "better than we expected." Defendant Byrne stated:

> [**Analyst**]: Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building. And I know that in your report that you filed in February that was mentioned there as well. *I was just wondering if you could update us on the status of that in terms of the components that are being fabricated, and so forth.*
>
> [**Defendant Byrne**]: *Yes. Dan, the shield building is going probably better than we had anticipated.* Our concern for the shield building really came from the contractor, their concerns, and at the time, that was Chicago Bridge and Iron. Now, Fluor has taken over. But we still retained the CB&I Services crew that is doing that welding. So even though CB&I Power exited the Consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay. *They're doing a tremendous job.*
>
>              \*   \*   \*
>
> *So overall, I'd say the shield building's going a little better than we expected.*

- 42 -

103.    On May 6, 2016, the Company filed its Quarterly Report on Form 10-Q with the SEC reporting its financial and operating results for the fiscal quarter ended March 31, 2016 (the "1Q2016 Form 10-Q"). The 1Q2016 Form 10-Q omitted or failed to disclose the results of the Bechtel Audit, that the Nuclear Project was mired in design flaws and cost overruns, and that there was serious concern about the financial health of the Nuclear Project's primary contractor, Westinghouse.

104.    The 1Q2016 Form 10-Q contained certifications by defendants Marsh and Addison pursuant to SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

105.    On July 28, 2016, SCANA held a conference call with analysts and investors to discuss the Company's second fiscal quarter 2016 earnings and operations. During the conference call, defendant Byrne assured the public that the Nuclear Project's "guaranteed substantial completion dates remain[ed]" the same despite the Bechtel Audit and the change of subcontractors from CB&I to Fluor. Defendant Byrne stated:

> [**Analyst**]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there; and ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.

> [**Defendant Byrne**]: Yes, Julien, this is Steve. *The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3. We don't see anything to change those.* Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. And remember that on the project now, we're dealing just with Westinghouse; Fluor is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and

- 43 -

see what it would take to accomplish those dates. So I don't expect anything dramatic to come from that.

106.    On August 5, 2016, the Company filed its Quarterly Report on Form 10-Q with the SEC reporting its financial and operating results for the fiscal quarter ended June 30, 2016 (the "2Q2016 Form 10-Q").  The 2Q2016 Form 10-Q omitted or failed to disclose the results of the Bechtel Audit, that the Nuclear Project was mired in design flaws and cost overruns, and that there was serious concern about the financial health of the Nuclear Project's primary contractor, Westinghouse.

107.    The 2Q2016 Form 10-Q contained certifications by defendants Marsh and Addison pursuant to SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

108.    On October 7, 2016, SCANA published a video through SCE&G on YouTube. The video included defendant Marsh speaking to reporter at the "V.C. Summer Media Day 2016" on September 21, 2016.  Defendant Marsh reaffirmed the Company's decision to proceed with the Nuclear Project, stating: "I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for use for a clean energy future."  When discussing challenges related to the project, defendant Marsh stated that SCANA had "been able to meet those challenges, make adjustments to the contract, and continue progress on the project."

109.    On October 27, 2016, SCANA held a conference call with analysts and investors to discuss the Company's third fiscal quarter 2016 earnings and operations.  During the conference call, defendant Byrne assured the public that the Nuclear Project's "guaranteed substantial completion dates remain[ed]" the same and that he did not "expect anything dramatic

to come from" the changed of subcontractors from CB&I to Fluor.  Assuring an analyst that

Westinghouse's subcontractor was "doing a good job," defendant Byrne stated:

> [**Analyst**]: Okay. And then I think in your last update report, there was also some discussion about Fluor maybe having some troubles in terms of staffing up for the evening shift or whatever.  I wondered if you could update us on that.
>
> [**Defendant Byrne**]: Yes, Fluor, when they first came in, identified the need to increase staffing and wanted to staff a full back-shift or night-shift because we'd been operating with a skeleton crew night-shift or back-shift up to that point. Initially, they had some difficulty in hiring, but I'd say that they recently have rectified that.... *So they're doing a good job.*  They're trying some innovative things, implementing multilingual workforces, those kinds of things.  *So we're very happy with what Fluor is doing for us.  So they've been very successful recently.*

110.    Also on October 27, 2016, SCANA issued a video on YouTube entitled "SCE&G

Welcomes News Media to Nuclear Construction Site" with "members of the V.C. Summer

leadership team."  The video, taken on September 21, 2016, at the "V.C. Summer Media Day

2016," contained an interview with defendant Byrne.  During the interview, defendant Byrne

stated that the "pace of this project is quickening.  Though we have run into some issues and

roadblocks in the past, most of those issues and roadblocks are behind us."

111.    On November 4, 2016, the Company filed its Quarterly Report on Form 10-Q

with the SEC reporting its financial and operating results for the fiscal quarter ended September

30, 2016 (the "3Q2016 Form 10-Q").  The 3Q2016 Form 10-Q omitted or failed to disclose the

results of the Bechtel Audit, that the Nuclear Project was mired in design flaws and cost

overruns, and that there was serious concern about the financial health of the Nuclear Project's

primary contractor, Westinghouse.

112.    The 3Q2016 Form 10-Q contained certifications by defendants Marsh and

Addison pursuant to SOX that the report did not "contain any untrue statement of a material fact

or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report."

113.    On February 14, 2017, SCANA issued a press release entitled "SCANA Receives Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project." Despite Westinghouse's parent company Toshiba's $6.3 billion write down associated with Westinghouse's operations, SCANA stated that Westinghouse was "committed to completing the [project]."

114.    On February 16, 2017, SCANA held a conference call with analysts and investors to discuss the Company's fourth fiscal quarter and the full fiscal year 2016 earnings and operations.  During the conference call, defendant Marsh stated that the Company anticipated "completing our two new nuclear units" despite the issues revealed in the Bechtel Audit.  He further indicated that SCANA was "making substantial progress on these new plants," stating:

> We continue to monitor Toshiba's financial situation and their proposed recovery plans.  Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units*, which will enable us to provide our customers with safe, reliable energy for decades to come....  *As you can see from Steve's [Byrne] update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes.*

115.    During the same conference call, defendant Byrne assured the public that SCANA would reach its 2020 deadline because "efficiency factors have increased significantly," construction was "going much, much more smoothly," and the Company was "getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us."  Defendant Byrne stated:

> [**Defendant Byrne**]: ...When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?
>
> [**Analyst**]: Sorry. Yes, the second new unit and the —

- 46 -

[**Defendant Byrne**]: Second new unit.

[**Analyst**]: -- 2020 deadline.

[**Defendant Byrne**]: Yes. *So what we've seen so far is that the efficiency factors have increased significantly ... and it's going much, much more smoothly.  So I have a reasonable confidence in the efficiency gains for the second new unit.*

\* \* \*

[**Analyst**]: And also, I think in an earlier question you were talking about the various critical paths, activities that you have coming up here over the first half of this year and going forward.  How close are you guys to getting to the point where the construction project is, like now becomes a more traditional construction project in the nuclear in and of itself is no longer like the defining factor in terms of getting from here to there?

[**Defendant Byrne**]: *Yes.  I think we're actually pretty close to that....  I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.*

116.    On February 24, 2017, the Company filed its 2016 Form 10-K with the SEC, providing the Company's financial results and position.  The 2016 Form 10-K was signed by defendants Marsh, Addison, Aliff, Bennett, Cecil, Decker, Hagood, Micali, Miller, Roquemore, Sloan, and Trujillo.  These defendants omitted or failed to disclose the results of the Bechtel Audit, that the Nuclear Project was mired in design flaws and cost overruns, and that there was serious concern about the financial health of the Nuclear Project's primary contractor, Westinghouse.  Instead, the 2016 Form 10-K stated that the new reactors were "used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates."  The 2016 Form 10-K also reported that the total estimated project cost ranged from $6.8 billion to $7.7 billion, that Unit 2 would be completed by August 2019, and Unit 3 by August 2020, despite having no basis for this claim given the Bechtel Audit's findings.

117.     The 2016 Form 10-K contained certifications by defendants Marsh and Addison pursuant to SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

118.     Between the dates of February 28 through March 2, 2017, SCANA participated in the 2017 UBS & Morgan Stanley Utilities Conferences.  The Company published a 2017 UBS & Morgan Stanley Utilities Conferences Presentation for investors and industry analysts.  The slide below, presented to the attendees, indicated that the current position of the manufacturing schedule for the Nuclear Project was nearly complete:



## THE TRUTH SLOWLY EMERGES

119.    The truth began to emerge about the disastrous state of the Nuclear Project when Westinghouse filed for bankruptcy in March 2017.   Cost overruns with the Nuclear Project associated with Westinghouse's poor design and construction progress pushed the primary contractor to financial ruin.  On March 29, 2017, Westinghouse petitioned in U.S. Bankruptcy Court for the Southern District of New York for protection under Chapter 11 of the U.S. Bankruptcy Code to avoid its fixed price contract approved by the SCPSC in May 2016.

120.    But even with the loss of its primary contractor, defendants continued to publicly assure state regulators that there would be no disruption in the construction of the Nuclear Project.  In an ex parte briefing held before the SCPSC, defendants Marsh, Addison, and Byrne provided testimony regarding Westinghouse bankruptcy filings.  For example, defendant Byrne stated that "Westinghouse has been generally cooperative and responsive to our requests for information," which the Company expected to continue, and that "work continues on-site without substantial disruption."  Defendants also presented a slide below to the SCPSC which included the alleged manufacturing completion schedule.  Despite the findings of the Bechtel Audit and Westinghouse's bankruptcy announcement, the slide below indicated that construction of the Nuclear Project was nearing completion:



121.    On July 27, 2017, the Company issued a press release that revealed that the cost of completing the Nuclear Project would far exceed Westinghouse's estimates.  The press release stated:

**South Carolina Electric & Gas Company And Santee Cooper Agree To Amount Of Guaranty Payments From Toshiba**

Cayce, SC, July 27, 2017… South Carolina Electric & Gas Company (SCE&G), principal subsidiary of SCANA Corporation (SCANA) (NYSE:SCG), and Santee Cooper, have entered into a definitive agreement with Toshiba Corporation (Toshiba) for Toshiba to pay $2.168 billion ($1.192 billion to SCE&G for its 55% and $0.976 billion to Santee Cooper for its 45% project ownership) in full satisfaction of its guaranty of obligations of Westinghouse Electric Company, LLC (WEC) under the engineering, procurement, and construction contract (the EPC Contract) for the two new nuclear units at the V.C. Summer Nuclear Station in Jenkinsville, SC.

In the agreement, Toshiba commits to make payments in a series of installments over a period beginning in October 2017 and ending in September 2022.  Certain of these payments may be satisfied by distributions through the bankruptcy court process from WEC to SCE&G and Santee Cooper.  These payments (which are subject to reduction if WEC pays creditors holding liens on project assets) are payable regardless of whether both or either of the two nuclear units are completed, or the project is abandoned.  If the units are completed and upon

- 50 -

completion actual construction costs, net of payment from Toshiba, are less than the specified maximum amount payable under the EPC Contract, Toshiba will have the right to receive part of the difference.

The project owners are continuing their efforts to determine the most prudent path forward for the nuclear project. *However, the project owners anticipate that the additional cost to complete both units beyond the amounts payable in connection with the EPC Contract will materially exceed prior WEC estimates as well as the anticipated guaranty settlement payments from Toshiba.* Additionally, the units would need to be online before January 1, 2021 to qualify for production tax credits, under current tax rules. At this point, the project owners believe that the units could not be brought online until after this date. The project owners are considering these factors, as well as their future generation needs, in their evaluation of the project. Based on these considerations, the alternatives of completing both units or one unit are subject to significant challenges. The owners expect to announce their decisions soon.

122.    With the cost of construction looming and only 40% of the Nuclear Project complete, the Company opted to abandon the Nuclear Project altogether. In a press release dated July 31, 2017, the Company announced that it would cease construction of the Nuclear Project due to construction delays and cost overruns. The press release, entitled "South Carolina Electric & Gas Company to Cease Construction and Will File Plan of Abandonment of the New Nuclear Project" stated:

**Cayce, SC, July 31, 2017...** South Carolina Electric & Gas Company (SCE&G), principal subsidiary of SCANA Corporation (SCANA) (NYSE:SCG), announced today that it will cease construction of the two new nuclear units (Units) at the V.C. Summer Nuclear Station in Jenkinsville, SC and will promptly file a petition with the Public Service Commission of South Carolina seeking approval of its abandonment plan. *This decision was reached by SCE&G after considering the additional costs to complete the Units, the uncertainty regarding the availability of production tax credits for the project, the amount of anticipated guaranty settlement payments from Toshiba Corporation (Toshiba), and other matters associated with continuing construction, including the decision of the co-owner of the project, the South Carolina Public Service Authority (Santee Cooper), the state owned electric utility, to suspend construction of the project.* Based on these factors, SCE&G concluded that it would not be in the best interest of its customers and other stakeholders to continue construction of the project.

Following the bankruptcy filing of Westinghouse Electric Company, LLC (WEC), SCE&G and Santee Cooper each began a comprehensive process of evaluating the most prudent path forward for the Units. The project owners

- 51 -

worked with WEC and Fluor Corporation, as well as other technical and industry experts, to evaluate the project costs and schedules.

Based on this evaluation and analysis, SCE&G concluded that completion of both Units would be prohibitively expensive. *According to SCE&G's analysis, the additional cost to complete both Units beyond the amounts payable in connection with the engineering, procurement, and construction contract would materially exceed prior WEC estimates, as well as the anticipated guaranty settlement payments from Toshiba.* Moreover, the Units would need to be online before January 1, 2021, to qualify for production tax credits, under current tax rules. SCE&G's analysis concluded the Units could not be brought online until after this date.

SCE&G also considered the feasibility of completing the construction of Unit 2 and abandoning Unit 3 under the existing ownership structure and using natural gas generation to fulfill any remaining generation needs. This option provided a potentially achievable path forward that may have delivered SCE&G a similar megawatt capacity as its 55% interest in the two Units and provided a long-term hedge against carbon legislation/regulation and against gas price volatility. SCE&G had not reached a final decision regarding this alternative when Santee Cooper determined that it would be unwilling to proceed with continued construction of two Units or one Unit. Consequently, SCE&G determined that it is not in the best interest of customers and other stakeholders for it to continue construction of one Unit.

Based on this evaluation and analysis, and Santee Cooper's decision, SCE&G has concluded that the only remaining prudent course of action will be to abandon the construction of both Unit 2 and Unit 3 under the terms of the Base Load Review Act (BLRA).

SCANA Chairman and CEO, Kevin Marsh, said "We arrived at this very difficult but necessary decision following months of evaluating the project from all perspectives to determine the most prudent path forward. Many factors outside our control have changed since inception of this project. Chief among them, the bankruptcy of our primary construction contractor, Westinghouse, eliminated the benefits of the fixed-price contract to our customers, investors, and other stakeholders. Ultimately, our project co-owner Santee Cooper's decision to suspend construction made clear that proceeding on our own would not be economically feasible. Ceasing work on the project was our least desired option, but this is the right thing to do at this time."

"Many of our employees have worked extremely hard over the years to build these new units. That's one of the factors that makes this decision particularly difficult. We are deeply grateful for all their contributions and will do our best to support those affected by these changes. We also recognize the impact that our path forward will have on customers, communities, shareholders, and the nuclear industry as a whole."

"Our belief in the benefits of nuclear generation -- not just for the state, but for the nation -- hasn't changed. As we have been doing for more than 30 years, we will continue providing customers with a valuable low-cost, non-emitting source of generation through our operating nuclear unit at V.C. Summer."

Normal construction activities at the site will cease immediately and efforts will be shifted toward an orderly transition of winding down and securing the project property. SCE&G plans to use the anticipated payments resulting from the settlement of Toshiba's guaranty to mitigate cost impacts to SCE&G electric customers.

123.    The next day, on August 1, 2017, SCANA filed a Petition for Prudency Determination Regarding Abandonment, Amendments to the Construction Schedule, Capital Cost Schedule and Other Terms of the BLRA Orders for the Nuclear Project with the SCPSC. SCANA petitioned to recoup $2.2 billion of the total expected losses of $4.9 billion from its ratepayers by increasing rates over the next twenty years. In a hearing before the SCPSC, the Commissioners were alarmed by the request, with one stating that the "Commission was blindsided yesterday by this news."

124.    In response to SCANA's abandonment of the Nuclear Project, South Carolina Attorney General Alan Wilson announced on August 4, 2017, that he was opening an investigation into SCANA's management of the project. Also during this time, South Carolina state Senate leaders called for a special legislative session to investigate SCANA's abandonment as well.

125.    In the wake of the increased scrutiny, SCANA withdrew its application for the recovery of the cost of abandonment. In a press release dated August 15, 2017, the Company stated that the voluntary withdrawal was in response to concerns raised by "various stakeholders and members of the South Carolina General Assembly, including legislative leaders." The press release stated:

**SOUTH CAROLINA ELECTRIC & GAS COMPANY TO VOLUNTARILY WITHDRAW ITS NEW NUCLEAR ABANDONMENT PETITION TO ACCOMMODATE THE LEGISLATIVE REVIEW PROCESS**

**Cayce, SC, August 15, 2017...** South Carolina Electric & Gas Company (SCE&G), principal subsidiary of SCANA Corporation (SCANA) (NYSE:SCG), announced today that it will voluntarily withdraw its Abandonment Petition from the Public Service Commission of South Carolina that was made under the Base Load Review Act (BLRA) concerning SCE&G's new nuclear project. Over the past two weeks, *SCE&G management has met with various stakeholders and members of the South Carolina General Assembly, including legislative leaders,* to discuss the abandonment of the new nuclear project and to hear their concerns. SCE&G's withdrawal decision was in response to those concerns, and to allow for adequate time for governmental officials to conduct their reviews.

"We have been meeting with governmental officials and various stakeholders since our announcement to abandon the new nuclear project," said Kevin Marsh, SCANA Chairman and CEO. "The purpose of these ongoing meetings is to discuss their concerns and to explain the path that led us to the abandonment decision. While ceasing construction was always our least desired option, based on the impact of the bankruptcy of Westinghouse on our fixed price construction contract, the results of our evaluation of the cost and time to complete the project, and Santee Cooper's decision to suspend construction, abandonment was the prudent decision."

126.    An article published on August 27, 2017, by *The Post and Courier* entitled "Early Signs of 'Incompetence at Every Level' Went Unheeded as South Carolina Rushed Toward 'Sexy' Nuclear Future" reported that SCANA applied to build the reactors with a "generic" schedule "that couldn't adequately forecast costs and completion dates." Workers from the site interviewed for the story pointed fingers at SCANA, who provided a blank check to Westinghouse and CB&I, but failed to monitor how money was spent. The article stated:

In July, state-run Santee Cooper and investor-owned SCANA Corp. abandoned the nuclear reactors. Electric customers, state regulators and South Carolina politicians all responded with astonishment.

But the failure of the two reactors near Jenkinsville didn't happen overnight, and the serious problems that occurred with the one of the first nuclear builds in the nation in roughly 30 years wasn't without its warning signs.

Laborers with decades of experience building other power plants across the country told The Post and Courier the project was failing for years — in no small

- 54 -

part, because the reactors were being built before the blueprints for construction were even finalized.

SCANA applied to build the reactors with a "generic" schedule that couldn't adequately forecast costs and completion dates. Only 40 percent of the construction-ready designs were completed by the time the Nuclear Regulatory Commission gave the go ahead to start pouring concrete and erecting steel.

When the two utilities pulled the plug last month, they still didn't have a fully-integrated construction schedule — a tool that links labor, supply chains and budgets together for planning purposes. Such a schedule is crucial for a project of this scope because there are so many moving parts and inter-related tasks that hinge on one another. It had been promised for years as temporary timelines were extended and cost overruns mounted.

Worse, the pre-fabricated pieces for the reactors that were meant to revolutionize nuclear construction and prevent cost overruns were manufactured incorrectly from the beginning. The complete Westinghouse reactor design didn't get approved by federal regulators until three years after the state allowed SCANA to start charging its electric customers.

\* \* \*

...SCANA held "ultimate responsibility" for constructing the reactors and executing the related contracts, state regulators told the utility in 2009. And, Santee Cooper had signed a deal that gave SCANA "primary responsibility" over the construction and startup of the plants. As a result, Santee Cooper had just three permanent employees on site, even as they issued roughly $4 billion in bonds for their share of the project.

*Laborers that worked on the reactors from the beginning compared the oversight of the project to a parent giving their child an unlimited credit card without bothering to check the monthly statements.*

"SCANA wants to sit back and holler about overrun budgets. SCANA let this take place," said Glenn Hagan, an ironworker of 39 years who worked as a lead training instructor at V.C. Summer. "You are the owner. That is your money."

127.   In a letter dated September 3, 2017, SCANA initially refused to provide South Carolina Governor Henry McMaster's demand for release of the Bechtel Audit. The Company cited its application to recover potentially billions of dollars from Westinghouse, and that waiver of the Company's privilege "likely would impair the ability of Santee Cooper and SCE&G to recover those damages against Westinghouse and its affiliates." The following day, on

September 4, 2017, South Carolina Governor McMaster compelled the release of the Bechtel Audit, threatening to terminate every member of the Santee Cooper Board if not released.

128.    After the release of the Bechtel Audit upon the Governor McMaster's demand, an article published by *The Post and Courier* highlighted the Individual Defendants' knowledge of ongoing issues listed in the Audit.   The article dated September 4, 2017, entitled "Audit Highlighted Problems With South Carolina Nuclear Project a Year Before Cancellation," stated that the Bechtel Audit "provides evidence that the partnering utilities knew of significant flaws with their primary contractor Westinghouse, but continued to tout the reactors being built at the V.C. Summer site and advocate for additional funding for a project already years behind schedule."  The article also noted that "SCANA officials told state regulatory staff members that they didn't have a physical copy of the report that they could share — a statement they contradicted under oath last month."

129.    With the release of the Bechtel Report indicating SCANA's knowledge of ongoing issues since at least February 2016, the fallout of SCANA's abandonment of the Nuclear Project now includes possible criminal charges.  In a press release issued on September 21, 2017, the Company announced that SCANA and its subsidiaries were served with a subpoena issued by the U.S. Attorney's Office for the District of South Carolina.   The subpoena is seeking documents related to the Company's management of the Nuclear Project.

130.    The following day, on September 22, 2017, Attorney General Alan Wilson, the Speaker of the South Carolina House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee requested that SLED launch a criminal investigation into the Company's management of the Nuclear Project.

131.     An article entitled "Stamped for Failure: Westinghouse and SCANA Used Unlicensed Workers to Design Abandoned S.C. Nuclear Reactors" published by *The Post and Courier*, revealed that the newspaper had obtained documents showing that SCANA's contractors used "construction drawings for the unfinished reactors were used at V.C. Summer without having them vetted and approved by professional engineers." The article, dated September 24, 2017, further revealed that unlicensed workers were used in the design of the reactors, "a potentially criminal shortcut." "The practice contributed to thousands of design revisions, construction setbacks, schedule changes and the ultimate demise of the reactors." One engineer quoted in the article stated that SCANA "enshrined incompetence" in the management of the Nuclear Project.

132.     On September 26, 2017, at the request of South Carolina State House leaders, SLED opened a criminal investigation into possible fraud associated with the Nuclear Project. Based on an investigation and hearings conducted by a South Carolina House legislative panel, the House leaders stated that "the proximate cause of the V.C. Summer collapse is a direct result of misrepresentation by SCANA and SCE&G." The House leaders further averred that "criminal fraud through the concealment of material information is also a plausible cause for the project's disastrous collapse" in a letter to SLED.

133.     Also on September 26, 2017, the ORS filed a Request for Rate Relief, seeking the suspension of rate hikes on ratepayers and the return of $1.7 billion that SCANA ratepayers had already paid for the Nuclear Project. The ORS argued that there were "material and adverse" deviations in the construction of the Nuclear Project that disallowed the rate hike under the BLRA. The ORS also cited to the Opinion of the South Carolina Solicitor General, which noted that the BLRA was "constitutionally suspect."

134.     In questioning witnesses at the South Carolina House Utility Ratepayer Protection Committee hearing on September 26, 2017, South Carolina Representative James E. Smith, Jr. highlighted these legal conclusions of the Solicitor General. The Solicitor General noted legal issues with the BLRA stemming from concerns of the overall constitutionality of the law. In the Opinion issued to various senior members of the South Carolina House of Representatives upon their request, the Solicitor General noted that the BLRA rewards abandonment of nuclear projects without receiving any service from the plants. The Solicitor General found the BLRA "constitutionally suspect," determining that the mandated transfer of money from ratepayers to investors for a private purpose to recoup losses without the plant ever being completed violates the Takings Clause of the South Carolina Constitution.

135.     An article entitled "Members of SCANA Board Lack Nuclear Expertise Yet Oversaw Failed S.C. Project While Earning a Combined $11M" published by *The Post and Courier* on October 15, 2017, exposed the Board's lack of nuclear expertise, a practice uncommon for a utility that deals in nuclear energy. The article called into question how a Board with no nuclear expertise oversaw the massive Nuclear Project, but still paid themselves more than $2 million in stock and cash for 2016 despite the serious concerns raised by the Bechtel Audit. The article stated:

> A sod grower from Orangeburg. A flooring business executive from Charleston. A financial adviser from Charlotte.
>
> They're all well-respected members of a select and powerful club that pushed a multibillion-dollar energy deal that was to fulfill the future electricity needs for millions of South Carolinians for decades to come.
>
> They're accustomed to success. But this time, they failed — on an epic scale.
>
> This influential group is the board of SCANA Corp., considered one of the most elite and coveted business gigs in the state. And it pays well for a part-time position. Last year, the nine outside directors each took home more than $200,000 in stock and fees.

Now, the prestigious panel is immersed in a full-blown legal and regulatory crisis amid the fallout of the scuttled V.C. Summer nuclear project. Its qualifications and decisions are being scrutinized.

Among the questionable actions: After an audit early last year raised serious concerns about the work at V.C. Summer, SCANA directors paid themselves more than $2 million in stock and cash for 2016 — a 12 percent raise from 2015. They also heaped extra financial rewards on the CEO and other senior executives.

Not surprisingly, the board has hunkered down since the company walked away from the project July 31, a move that has triggered at least one shareholder lawsuit and investigations by state and federal law enforcement agencies.

The directors have big responsibilities, overseeing business decisions on behalf of shareholders of a $4.23 billion-a-year Fortune 1000 company that operates in South Carolina, North Carolina and Georgia. But according to critics, SCANA is lacking in nuclear expertise at the board level, unlike its larger peers in neighboring states.

For now, all eyes are fixed on tiny Jenkinsville, north of Columbia, where SCANA was expanding the V.C. Summer Nuclear Station under a 55-45 partnership with state-run Santee Cooper. Work began in 2009 on what was a landmark project, given it had been about three decades since any new nuclear reactors were built in the U.S. About $9 billion went into the nearly decade-long effort to extend the life of the aging plant by the time lead contractor Westinghouse Electric filed for bankruptcy and work was halted, costing 5,000 workers their jobs.

While the project has been declared dead, SCANA continues to collect about $37 million a month, or a nearly a half-billion dollars annually, from ratepayers through its South Carolina Electric & Gas unit to pay for it, as allowed under state law. About 18 percent of each SCE&G customer's monthly bill goes toward the debt.

136. The SEC has also begun its own investigation relating to the Company's reporting to investors on the Nuclear Project. On October 17, 2017, the Company issued a press release entitled "SCANA Corporation to Cooperate with Securities and Exchange Commission Investigation Relating to Nuclear Project." In the press release, the Company announced that SCANA and its subsidiaries had been served with a document subpoena issued by the SEC in connection with an investigation the federal agency is conducting relating to the Nuclear Project.

137.     A press release entitled "SCE&G Proposes $4.8 Billion Solution To Replace New Nuclear Project" issued by the Company on November 16, 2017, stated that the utility had proposed a solution of cost sharing between ratepayers and investors for SCANA's multibillion-dollar failure.  While ratepayers would see a rollback on rates by approximately $90 million, or 3.5%, ratepayers would still incur a $29.5 million a month fee overall for costs associated with the Nuclear Project.   This adjustment, made amid intense pressure from regulators and legislators, amount to a charge of $810 million and an absorption of $2.9 billion in nuclear amortization costs over the next 50 years.  To make matters worse, SCANA announced that it was cutting its own operating revenues by $450 million over the next five years.

138.     An article entitled "SCE&G Wants Customers to Pay $29.5 Million a Month for Failed S.C. Nuclear Reactors" published by *The Post and Courier* on November 16, 2017, noted that SCE&G customers would still be paying $25 per month for the failed Nuclear Project. Investors, on the other hand, would be footing the rest of the bill, with the proposal shifting much of the onus on them.  Quoted in the article, South Carolina Representative Kirkman Finlay called the proposal a "slap in the face" that has "created a whole new world of bad blood."

139.     Defendant Marsh, SCANA's CEO, and defendant Byrne, SCANA's COO, were responsible for planning, approving, and executing the Nuclear Project.  In October 2017, defendants Marsh and Byrne announced their retirements in the wake of the revelations of their wrongdoing described herein.  Despite the abandonment of the Nuclear Project due to design flaws, construction delays, and cost overruns attributed to defendants Marsh and Byrne's mismanagement, these defendants will receive golden parachutes totaling $20 million in severance compensation.

140.    In total during this period, SCANA's stock price has fallen almost 40%, from a high of $76.12 per share on July 6, 2016 while the Bechtel Audit remained concealed, to a low of $45.91 per share by October 30, 2017, after the revelation of its concealment trickled into the market, a loss of $30.21 per share.  Market capitalization fell more than $4.3 billion in little over a year.

## REASONS THE STATEMENTS WERE IMPROPER

141.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Nuclear Project was mired in design flaws, construction delays, and cost overruns;

(b)    that the Company was touting the progress, cost, and completion schedule despite these ongoing issues;

(c)    that the Company received the Bechtel Audit revealing serious design, construction, and cost headwinds that was not disclosed to stockholders;

(d)    that a formal construction schedule for the Nuclear Project was never in place prior to and during construction;

(e)    that there were serious concerns about the financial health of SCANA's primary contractor, Westinghouse; and

(f)    as a result of the foregoing, the officers' and directors' representations concerning the Company's operation of the Nuclear Project were improper.

## DAMAGES TO SCANA

142. As a result of the Individual Defendants' improprieties, SCANA disseminated improper, public statements concerning the Nuclear Project. These improper statements have devastated SCANA's credibility as reflected by the Company's almost $4.3 billion, or 40%, market capitalization loss.

143. SCANA's performance issues also damaged its reputation within the business community, government agencies, and in the capital markets. In addition to price, SCANA's current and potential customers consider a company's ability to accurately value its business prospects and evaluate financial prospects. Businesses are less likely to transact with companies that are uncertain about their own operations or companies that are unable to perform on contracts. SCANA's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

144. Further, as a direct and proximate result of the Individual Defendants' actions, SCANA has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b) costs incurred from defending and paying any settlement in various pending litigation filed by SCANA's ratepayers;

(c)	costs incurred from any criminal or civil damages as a result of actions filed by the South Carolina Attorney General or the U.S. Attorney's Office for the District of South Carolina;

(d)	costs incurred from the SEC, the South Carolina state Senate, and SLED investigations; and

(e)	costs incurred from compensation and benefits paid to the defendants who have breached their duties to SCANA.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

145.	Plaintiff brings this action derivatively in the right and for the benefit of SCANA to redress injuries suffered, and to be suffered, by SCANA as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. SCANA is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.	Plaintiff will adequately and fairly represent the interests of SCANA in enforcing and prosecuting its rights.

147.	Plaintiff was a stockholder of SCANA at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current SCANA stockholder.

148.	The current Board of SCANA consists of the following ten individuals: defendants Marsh, Aliff, Bennett, Cecil, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Marsh, Aliff, Bennett, Cecil, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo Face a Substantial Likelihood of Liability for Their**

**Misconduct**

149. As alleged above, defendants Marsh, Aliff, Bennett, Cecil, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding SCANA's ongoing issues with the Nuclear Project. Further, pursuant to the Company's reporting structures, defendants Marsh, Aliff, Bennett, Cecil, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo were alerted to design flaws, construction delays, and cost overruns, as well as financial issues with SCANA's primary contractor, Westinghouse, pursuant to the various red flags waived prominently and repeatedly in their face, including the Bechtel Audit. Nevertheless, in violation of defendants Marsh, Aliff, Bennett, Cecil, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo's duty of loyalty, the wrongdoing described herein continued.

150. Defendants Aliff, Bennett, Cecil, Hagood, and Miller, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee defendants Aliff, Bennett, Cecil, Hagood, and Miller face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

151. Defendants Bennett, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo, as members of the Nuclear Oversight Committee, were charged with monitoring, discussing, and evaluating SCANA's nuclear operations, "which include regulatory matters, operating results, training and other related topics." Despite their knowledge or reckless disregard, the Nuclear Oversight Committee Defendants caused improper statements regarding the progress, cost, and construction schedule of the Nuclear Project, even in the face of the Bechtel Audit. Accordingly, the Nuclear Oversight Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Bennett, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. The Individual Defendants owed and owe SCANA fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe SCANA the highest obligation of good faith, fair dealing, loyalty, and due care.

154. The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within SCANA, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

155.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.    The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) that the Nuclear Project was mired in design flaws, construction delays, and cost overruns; (ii) that the Company was touting the progress, cost, and completion schedule despite these ongoing issues; (iii) that the Company received the Bechtel Audit revealing serious design, construction, and cost headwinds that was not disclosed to stockholders; (iv) that a formal construction schedule for the Nuclear Project was never in place prior to and during construction; and (v) that there were serious concerns about the financial health of SCANA's primary contractor, Westinghouse. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

156.    The Director Defendants, as directors of the Company, owed SCANA the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's concealment of design flaws, construction delays, and cost overruns associate with the Nuclear Project.   The Director Defendants knew or were reckless in not knowing: (i) that the Nuclear Project was mired in design flaws, construction delays, and cost overruns; (ii) that the Company was touting the progress, cost, and completion schedule despite these ongoing issues; (iii) that the Company received the Bechtel Audit revealing serious design, construction, and cost headwinds that was not disclosed to stockholders; (iv) that a formal construction schedule for the Nuclear Project was never in place prior to and during construction; and (v) that there were serious concerns about the financial health of SCANA's primary contractor, Westinghouse.   Accordingly, the Director Defendants breached their duty of loyalty to the Company.

157. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

158. The Nuclear Oversight Committee Defendants breached their fiduciary duty of loyalty by failing to monitor, discuss, and evaluate SCANA's nuclear operations, "which include regulatory matters, operating results, training and other related topics." Even in the face of the Bechtel Audit, revealing ongoing issues with the Nuclear Project, the Nuclear Oversight Committee Defendants continued to allow the dissemination of improper statements about the progress, cost, and construction schedule of the Nuclear Project, which they knew or were reckless in not knowing contained improper statements and omissions.

159. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SCANA has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

160. Plaintiff, on behalf of SCANA, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Against the Individual Defendants for Waste of Corporate Assets**

161. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162. As a result of the Individual Defendants' failure to conduct proper supervision of the Nuclear Project and to ensure that the Company's SEC filings were accurate, SCANA is

subject to numerous securities and consumer class action lawsuits. Further, the Company is now the subject of ongoing investigations led by various governmental, regulatory, and legislative parties, including the South Carolina Legislature, the SLED, the South Carolina Attorney General, the SEC, and the U.S. Attorney's Office for the District of South Carolina.

163. In addition, the Individual Defendants have caused SCANA to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

164. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

165. Plaintiff, on behalf of SCANA, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

#### Against the Individual Defendants for Unjust Enrichment

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of SCANA. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to SCANA. This includes the more than $20 million in severance compensation provided to defendants Marsh and Byrne upon their retirements, despite their participation in the wrongdoing described herein.

168. Plaintiff, as a stockholder and representative of SCANA, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

169.    Plaintiff, on behalf of SCANA, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of SCANA, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing SCANA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SCANA and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's oversight of major construction projects;

2.    a proposal to strengthen the Company's controls over the nomination and selection of primary and subcontractors on major construction projects;

3.    a proposal to strengthen the Company's controls over financial reporting;

4.    a proposal to strengthen SCANA's oversight of its disclosure procedures;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

6.      a provision to permit the stockholders of SCANA to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of SCANA has an effective remedy;

D.      Awarding to SCANA restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 13, 2017                    Respectfully submitted,

James M. Griffin (SC ID. #9995)
GRIFFIN & DAVIS LLC
Post Box Office 999
Columbia, SC 29202
Telephone: (803) 744-0800
Facsimile: (803) 744-0805
E-mail: jgriffin@griffindavislaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
GREGORY E. DEL GAIZO
600 B Street, Suite 1900

- 70 -

San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
      csmith@robbinsarroyo.com
      gdelgaizo@robbinsarroyo.com

RICHARD A. HARPOOTLIAN, P.A.
RICHARD A. HARPOOTLIAN
Post Office Box 1040
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
E-mail rah@harpootlianlaw.com

Attorneys for Plaintiff

1221752

NAV

<u>VERIFICATION</u>

I, John Brewer, hereby declare as follows:

I am the Executive Director of the Firemen's Retirement System of St. Louis, the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment on behalf of SCANA Corporation.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 12/13/17

_____
JOHN BREWER